Filed 8/9/13  P. v. Henderson CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DONTAYE HENDERSON,<br><br>    Defendant and Appellant. | D061481<br><br><br>(Super. Ct. No. SCN286323) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert J. Kearney, Judge.  Affirmed.

Martha L. McGill, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kristine Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

This case arose when Dontaye Henderson shot his wife Tamara Henderson (Tamara)[1] to death.  A jury convicted Henderson of first degree murder (count 1:  Pen. Code, § 187, subd. (a)) and possession of a firearm by a felon (count 2:  Pen. Code, § 12021, subd. (a)(1)).  The jury found true allegations that, in committing the murder, Henderson intentionally and personally discharged a firearm (a handgun), proximately causing Tamara's death within the meaning of Penal Code section 12022.53, subdivision (d), and that he personally used the handgun within the meaning of Penal Code section 12022.5, subdivision (a).  In a bifurcated proceeding, the court found true allegations that Henderson previously served a prison term for a violent felony (Pen. Code, § 667.5, subd. (a)), he had one prior serious felony conviction (Pen. Code, § 667, subd. (a)(l)), and he had one prior "strike"[2] conviction (Pen. Code, §§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).  The court sentenced Henderson to a total prison term of 80 years to life.

Henderson appeals, contending (1) the court abused its discretion under Evidence Code section 352 by admitting evidence that he committed prior acts of domestic violence against his former wife, J.H.; (2) the court's application of Evidence Code section 1109 to admit evidence of prior acts of domestic violence rendered his trial fundamentally unfair, thereby depriving him of his federal constitutional right to due process; (3) the court's instructions to the jury under CALCRIM No. 852 violated his

---

[1]	As Henderson and his deceased wife shared the same last name, we refer to her as Tamara.  We intend no disrespect.

[2]	"We use the term 'strike' to describe a prior felony conviction that qualifies a defendant for the increased punishment specified in the Three Strikes law." (*People v. Fuhrman* (1997) 16 Cal.4th 930, 932, fn. 2.)

2

federal constitutional right to due process by allowing the jury to find by only a preponderance of the evidence that he committed uncharged prior acts of domestic violence, and then to infer his guilt of the currently charged offense from the commission of the prior acts; (4) the prosecutor committed misconduct during his cross-examination of Henderson by asking questions implying defense counsel had attempted to conceal information from the jury and fabricated Henderson's defense of accident; and (5) the cumulative effect of the errors deprived Henderson of a fair trial, thereby requiring reversal of the judgment. We affirm the judgment.

## FACTUAL BACKGROUND

A. *The People's Case*

1. *The murder*

In late 2008, Tamara, who was then 25 years of age, began dating Henderson. Tamara had a five-year-old daughter, Niya.

Tamara and Henderson married in early January 2009, less than three months after they met. Their son, Nehemiah, was born in late September 2009. The family lived in an apartment on Paseo de Laura in Oceanside.

On January 1, 2011,[3] Henderson and Tamara had plans to meet Tamara's mother, Elsie, and Tamara's younger sister, Tara, at around 11:00 a.m. for church services in San Diego. However, Henderson and Tamara did not show up. Instead, about 10:44 a.m., a text message was sent to Elsie from Tamara's cell phone stating, "Mom, if you haven't

---

[3]    All further date references will be to calendar year 2011.

3

already left yet, can we catch a ride with you to church?"  The message seemed unusual to Elsie because it takes almost an hour to get to San Diego from Oceanside.  Elsie telephoned Tamara's cell phone, but there was no answer.

At Elsie's request, Tara sent Tamara a text message asking where she was.  Tara got a text back from Tamara's phone stating, "We not coming.  Call me when you can." Tara suspected the message was not from Tamara because Tamara's grammar would have been correct, and she would have said, "We're not coming."  Tara dialed Tamara's number and Henderson answered.  He said Tamara was in the shower and would call Tara back.  Henderson then hung up.

At 11:09 a.m., Henderson dialed 911 using Tamara's cell phone.  He told the dispatcher his wife (Tamara) "hurt herself real bad."  Henderson said Tamara had an asthma attack, fell, and hit her head.  Answering questions from the 911 dispatcher, Henderson indicated Tamara was still conscious but was barely breathing, and she was turning purple, having cold sweats, and not moving.  The dispatcher gave Henderson instructions to put her on the ground, check her airway, and listen for any breathing. Henderson urged the dispatcher to hurry up and send an ambulance.  He then said, "She's hurt really bad."  "It was all an accident.  I swear.  She didn't mean to do all the other stuff."  He added that the paramedics were taking too long, said "God bless," asked the dispatcher to have him picked up at a nearby hotel, and hung up.

Henderson again called 911 back at 11:22 a.m.  He asked whether the paramedics had helped his wife, and stated, "I was just wondering if they um was [*sic*] able to um resuscitate and help her."  The dispatcher told Henderson the paramedics were on the

4

scene and asked him to stay on the line. Henderson hung up. Henderson called back a minute later, and the dispatcher asked him where he was. Henderson responded, "I was wondering . . . what happened?" The dispatcher asked him two more times where he was. Henderson said, "Well I need to just have some time to breathe right quick," and said he was "just making sure that she's okay." When the dispatcher again asked where he was, Henderson asked, "Did they help her? That's what I need to know." When the dispatcher made a fourth request for Henderson's location, he said he was outside apartment 5. Henderson hung up.

Firefighter-paramedics David Overton and Brian Tucker responded to the 911 call. Niya and Nehemiah came to the door. Niya was crying, and Overton asked her where Tamara was. Niya pointed to the master bedroom. Tamara was face up on the bed. A wedding photo was on her waist and a smaller photo of Henderson was face down on her chest. When Tucker lifted up the smaller photo, he saw that Tamara's blouse was unbuttoned and there was a hole in the center of her chest. Overton called for police backup and asked Niya what happened. Niya replied that Tamara was dead, and Henderson had shot her. Overton asked Niya where Henderson was, and Niya said he went to a friend's apartment. When asked whether Henderson had a gun, Niya said he took it with him.

Tamara was airlifted to a hospital, where she was pronounced dead on arrival.

Bethann Schaber, M.D., a deputy medical examiner with the San Diego County Coroner's office, performed an autopsy on Tamara's body. Tamara had a penetrating gunshot wound to her torso. The shot traveled front to back, slightly downward, hitting

5

several vital organs. Death occurred within a matter of minutes. There was no soot or stippling, meaning the shooter was standing more than a few inches away. The cause of death was a gunshot wound, and the manner of death was homicide.

2. *Statements by Tamara's daughter, Niya*

Several members of law enforcement responded to the scene. Officer Johann Stenn asked Niya if any adults were at home, and Niya replied, "Just my mom, but she's dead." Officer Steen asked, "Where's your daddy?" Niya said, "He left and he had a gun."

Lieutenant Michael Goldsmith took Niya and Nehemiah to a nearby apartment, where the Thorpes, who were friends of the family, lived. Lieutenant Goldsmith asked Niya where her father was, and she said he left. When Lieutenant Goldsmith asked what happened, Niya indicated Tamara unplugged Henderson's razor, he got upset, and Tamara hit or pushed him. Niya then said, "He got a gun and shot my mom and now she's dead."

Niya testified she heard an argument between Henderson and Tamara. The argument was about Henderson cheating on Tamara. Both were standing on the same side of the bed and during the argument Henderson got a gun from underneath the bed and shot Tamara.

3. *Henderson's contact with female friends*

Jessica Sutton testified she dated Henderson when she was in high school. He had already graduated. In November 2010, Sutton contacted Henderson through Facebook, and the two exchanged phone calls and text messages. Henderson told her he was married but separated, and his wife did nothing but fuss, which got on his nerves. He

asked Sutton for pictures of herself and she sent some to him, including a photo of herself naked. On January 1, when Sutton still lived in Alabama, Henderson sent her a text message stating he was getting ready to fly out to visit her. Hours later she texted him and asked whether he had arrived yet. She did not get a response.

Wendy Thompson became friends with Henderson before he married Tamara. Henderson later told her he knew somebody, just out of prison, who needed a gun, and he asked her to help him find one. On another occasion, Henderson called Thompson and said he was having problems with his wife. He visited her at her home in December 2010. He was upset and said his wife wanted to leave him for a former boyfriend and take their child. On January 1, he sent Thompson a text message stating, "I left my wife for good." Thompson texted back, "Why?" Henderson did not respond and she never heard from him again.

4. *Henderson's flight*

After taking the children over to the Thorpe's residence, Lieutenant Goldsmith asked Ayorinde Thorpe to telephone Henderson's cell phone number. Henderson answered the phone and told Thorpe he was up the road. Lieutenant Goldsmith and Thorpe walked up Paseo de Laura, and Lieutenant Goldsmith had Thorpe call Henderson again. Henderson said he was at the end of the cul-de-sac, he had a gun, and he was going to kill himself. Henderson was not in his stated location, and, when Thorpe called him again, Henderson said he was on the top floor of the Extended Stay Motel on Vista Way and would meet Thorpe in the lobby. Henderson again said he had a gun and was thinking of killing himself.

7

Lieutenant Goldsmith drove Thorpe to the motel and had Thorpe call Henderson. Henderson said he was on the second floor at the west end of the motel, and hung up. Lieutenant Goldsmith drove Thorpe home, then set up a command post around the motel. Lieutenant Goldsmith then telephoned Henderson, who said he was going to kill himself so that he did not have to be involved in the court system. Lieutenant Goldsmith asked Henderson what room he was in but he refused to answer. Lieutenant Goldsmith started evacuating the motel and summoned a crisis negotiation team. Once the motel was fully evacuated, it was discovered Henderson was no longer there.

Henderson was on parole at the time of the shooting in this case. As conditions of his parole, he was prohibited from possessing firearms and was required to wear a GPS monitoring bracelet on his ankle at all times. At 11:20 a.m. on January 1, Henderson's parole agent, Mike Shanahan, received notice by alarm that there was interference with Henderson's ankle bracelet. A few minutes later, Shanahan received a call from Henderson, who told Shanahan he and Tamara had a big argument and she was shot. Henderson added he was sorry and he wanted to turn himself in. Shanahan asked Henderson where he was, and he responded, I'm at a hotel in Oceanside." Henderson hung up and did not turn himself in. Using the GPS monitoring system, Shanahan tracked the ankle bracelet to the Extended Stay Motel. The ankle bracelet had been cut off and was in a trash can inside the motel.

5. *Testimony of Consuelo Ramirez*

Consuelo Ramirez testified under a grant of immunity. She testified that she and Henderson worked together and she did not know him very well. In the morning on

8

January 1, she took her son Abraham to work with her, and there she received a call from Henderson. Henderson told her he needed a ride to work and would wait for her outside the Extended Stay Motel. When Ramirez picked·him up, he asked her to stop at an ATM. Henderson withdrew money from three separate ATM machines.

When they arrived at work, Henderson asked Ramirez for a ride to his mother's house because she was sick and he was worried about her. Henderson directed Ramirez to take the State Route 78 freeway to Interstate 15 southbound. They stopped at a gas station and Henderson took Ramirez's keys. When they got back on the freeway, he told Ramirez to stay in the slow lane and not exceed 65 miles per hour. Ramirez asked Henderson what was going on, and he said he missed his mother; she was very sick and he needed to see her.

Ramirez told Henderson that under her child custody agreement, she could not leave San Diego. Henderson asked her to stop at a casino. He then told her there was an "incident" at his house, and that a man came over with a gun and demanded Henderson's personal property. Henderson said he got his own gun and shot the man.

Ramirez also testified that after driving for a couple of hours they ended up in El Centro. They stopped at various hotels until Henderson found one that accepted cash. Ramirez asked him if she could go home, but Henderson insisted she stay. Henderson registered at the hotel using a fake name and address. Henderson wanted Ramirez to stay and, as it was getting dark, they spent the night at the hotel.

The next morning, Ramirez begged Henderson to let her go, explaining that she needed to return Abraham to his father. They drove to a taxi stop, where he obtained

9

directions to the Greyhound bus station. Henderson took Ramirez's cell phone from her, and when they arrived at the Greyhound station, it was closed. He directed Ramirez to a large hotel, said he would stay there, and she could go. Henderson returned Ramirez's cell phone to her.

6. *Henderson's arrest*

After Henderson disappeared, investigators obtained his cell phone records and discovered he had made several calls to Ramirez. A "be on the lookout" bulletin was issued describing Henderson, Ramirez and Ramirez's vehicle. Ramirez turned herself in the next day at the San Marcos sheriff's substation. Officers followed the route Ramirez and Henderson had taken. They learned from surveillance footage at various locations that Henderson had gone to the Acorn Casino near Interstate 8, a K-Mart, the Super Star Hotel, a restaurant, and the Premier Inn in El Centro. He checked into the Premier Inn using the name "James Wilson" with an address on Fairlane Avenue in Lexington, Kentucky.

Oceanside police eventually learned Henderson was traveling by bus to Lexington, Kentucky, using the name Dwayne Anderson, and had a layover in St. Louis. Henderson was arrested in St. Louis on January 4. When he was arrested, Henderson had a gun in a camera case, along with two magazines and a partial box of ammunition. He also had a woman's wallet containing credit cards and identification in his wife's name. These items, along with other property in Henderson's possession when he was arrested, were turned over to the Oceanside Police Department.

10

Henderson told the St. Louis police he and his wife got into an argument while getting ready for church. He said he got the gun and pointed it at her to intimidate her and, as they both became more angry, he pulled the trigger but the gun did not fire. As she yelled obscenities at him and pushed him, he became enraged. He said he racked the gun, pointed it at her chest, and shot her. He did not tell the St. Louis police the shooting was an accident. There is no video or audio recording of Henderson's statements. On the way back to San Diego from St. Louis, Henderson told a district attorney's investigator he was planning to flee to Honduras.

The gun found in Henderson's possession was a .40 caliber semiautomatic pistol.

7. *Forensic evidence*

Pamela Armijo, a field evidence technician with the Oceanside Police Department, went to Henderson's apartment about three hours after the murder. There was a yellow cloth towel on top of the bed with blood on it. An electric razor was on the right side of the bed, along with a .40 caliber cartridge.

Scott Hoopes, a criminalist and firearms expert, performed an analysis on the gun Henderson had when he was arrested, a Taurus PT940 semiautomatic pistol. In order to fire the gun, the shooter would have to manually pull back the slide to get one round from the magazine into the chamber. There were two safety mechanisms, one external and the other internal, designed to prevent accidental discharge. A person must disengage the safeties and exert pressure on the trigger for the gun to fire. In single-action mode, it takes 5.75 pounds of pressure; in double-action mode, it takes 9.25 pounds of pressure.

11

Hoopes test-fired the gun. It worked properly. A bullet recovered from Tamara's body at the autopsy was fired from that weapon.

8. *Evidence of Henderson's prior acts of physical domestic violence* (*Evid. Code, § 1109 propensity evidence*)

J.H. testified that in May 2002 she was living in Atlanta, where she was looking for work as a singer and actress. She met Henderson during an audition, they dated for a couple of months, and then got married. Henderson became very controlling. He isolated J.H. from her friends and family and destroyed her address books. When she told Henderson she wanted to end the relationship, he threw her against a wall, grabbed a cable cord from the television, and wrapped it around her neck until she could not breathe.

J.H. testified that Henderson stopped going to work so he could be with her 24 hours a day. She could not even go to the restroom by herself; Henderson would follow her in while she was using it. When she asked Henderson why he was following her, he replied, "Because I don't want you to go anywhere." Henderson did not allow her to make any phone calls.

J.H. also testified Henderson was violent with her every day. He told her several times, "If you ever leave, I will kill you." When she tried to walk out of the apartment, Henderson became violent and said, "If you're trying to leave, I wouldn't do that because I will hurt you." He showed J.H. a black handgun, which he kept in a closet. Henderson played around with the gun as if to say, "If I ever need to use this, I'm just letting you know it's here."

12

J.H. testified she started to slowly pack items so she could escape. At the end of January 2003, she went to the home of one of her mother's friends. From there, she took a bus to Houston and moved in with one of her sisters. Henderson constantly called and e-mailed her, begging her to take him back and saying he could not live without her. He told J.H. he would kill himself if she did not return to him and promised to change.

J.H. decided to give Henderson another chance and allowed him to live with her in Houston. A week later, he became violent again. He choked her, hit her, threatened to kill her, kicked her, slapped her, pushed her, ripped her clothes, and cursed at her. Henderson told her, "If I can't have you, then no one else can." The violence occurred on a daily basis. J.H. called the police on two occasions, but after they arrived she was afraid to file a report.

After two weeks of abuse, J.H. contacted her brother-in-law and she went to live with him and her sister in Camp Pendleton. Although she had not told Henderson where she was going, he found out where she was. He called her, promised to get counseling, begged her to come back, and threatened to kill himself if she did not. J.H. got a job at a mall, Henderson somehow found out where she was working, and he called her employer. He told J.H.'s employer she was a prostitute and sold crack cocaine. As a result, she was fired.

Henderson called J.H. and said he was coming to California and he knew she had a sister living there. He showed up and confronted J.H. while she was at a mall shopping, and told her, "I'm coming to get you so we can be together. We're meant to be, so I've come to get you." J.H. accompanied him because she was afraid. Henderson hailed a

13

cab and took her to a hotel. In the hotel room he told J.H. he loved her and would never let her go. When she told him she did not want to be with him, he grabbed her and said, "You're not going anywhere." J.H. broke free and ran from the room into the lobby, where she asked the clerk to call the police. Henderson grabbed her again and dragged her along the lobby floor back into the room. J.H. later escaped and went back to the lobby where the police were waiting for Henderson. J.H. eventually divorced him.

B. *The Defense*

Henderson testified in his own defense. He testified that on the morning of January 1, he was at home with Tamara, Niya, and Nehemiah, getting ready for church. At some point, he and Tamara began to argue. She made some hurtful statements and told him she might leave him.

Henderson testified he had acquired a handgun for home protection about a month earlier after someone tried to break into their apartment late at night. He knew he was not permitted to have a gun, because he had been convicted of a felony and was on parole. The gun was kept in the bedroom, on his wife's side of the bed, because she had served in the military and was more familiar with firearms than he was.

At some point during the argument, Tamara got the gun, threw it on the bed, and told Henderson he was always talking about killing himself, but she knew he was not going to do it. Henderson picked up the gun, which was loaded. The safety was off, but he did not think there was a round in the chamber. He picked up the gun to intimidate Tamara and to get her attention by threatening suicide. To prove he was serious, he pulled back the slide, clicked off the safety, and caused a round to come out of the gun.

He then pointed the gun at his head. Initially, Tamara did not react, which led Henderson to believe she did not think he was going to go through with committing suicide. He told her that if she let him die, she did not love their children. He admitted to her that he enjoyed the pictures of Sutton that Tamara had found on his cell phone, and this infuriated Tamara and caused her to become more hostile. While this was going on, he was waving the gun around, trying to get Tamara's attention. He had his finger on the trigger, and Tamara tried to get the gun out of his hand. She slapped him on the chest and face, causing his glasses to fall off. When she slapped him, he moved the gun away from his head, and he waved it around to try to make her stop hitting him. The gun discharged when she pulled or jerked his hand as she was trying to get the gun away from him.

Henderson testified that when the gun went off, he did not know Tamara had been hit. She said, "I'm so sorry," took two steps toward him, and fell into his arms. He said he did not mean for the gun to do that, it was not supposed to do that. He then laid her down on the floor in the hallway. Later, he picked her up and put her on the bed. When he saw she had been shot in the chest, he realized it was a severe injury and she needed medical care. Immediately after the shooting, he called 911 to get help, but he did not say anything because Tamara protested and pulled his hand away from the phone as he was calling. She told him she was worried the children would be taken away. When Henderson told her he was calling for medical assistance, she told him to get the car keys and take her to the hospital. He looked for the car keys in the apartment and in and around their car, but did not find them. He messed up the living room and bedroom

15

looking for the keys. He then went outside and called 911, but did not say he shot his wife, because he was scared. He went back inside and told his wife he had called 911. She told him she would tell the police the shooting was an accident. At Tamara's request, he gave her two family pictures to hold. Henderson testified he put the gun and ammunition in the camera bag to keep them away from the children, kissed his wife, apologized, told her he loved her, and left. He did not take the children because he did not want people to think they had been harmed or kidnapped. Tamara was still breathing and talking during the second 911 call, but she was pale. When he left, she was still speaking, but barely.

After he left the apartment, Henderson went to a nearby hotel, where he cut off his GPS bracelet and threw it in the trash. When he talked to the police on the phone, he lied to them about where he was. He eventually made contact with Ramirez and ended up in El Centro. He withdrew money from three ATM's, because he had promised to pay Ramirez for her time. He testified he did not take Ramirez's cell phone or keys. He planned to visit his father and his children in various parts of the country and then turn himself in. He was not trying to leave the country and did not turn himself in immediately because he wanted his wife to be able to tell the police the shooting was accidental.

Henderson also testified that he went to St. Louis, where he was arrested. He did not intentionally take Tamara's identification when he left. She had put her wallet in his camera bag, and at first he did not know the wallet was there. He took the gun and the bullets so that he could eventually turn them over to the police.

16

Henderson denied that his intent was to kill his wife so that he could leave her for another woman. The shooting was not on purpose. He did not intentionally shoot his wife; it was an accident. He did not tell the police in St. Louis he shot his wife because he was angry at her. He did not tell them he and his wife argued or that he got a gun and pointed it at her. He told them the shooting was an accident.

C. *The People's Rebuttal Evidence*

Ayorinde Thorpe testified that he telephoned Henderson on January 1 at a police officer's request. Thorpe asked what happened, and Henderson responded, "I'm not going to tolerate cheating."

Detective David Rudolph of the St. Louis Metropolitan Police Department testified that he detained Henderson on January 4 at a bus station in St. Louis. As Detective Rudolph was getting ready to explain the charge, Henderson said, "I know why I'm under arrest. I'm under arrest for shooting my wife." As they were walking out of the bus terminal to Detective Rudolph's police car, Henderson asked, "Is my wife dead? Did I kill her?" When Henderson kept asking that question, Detective Rudolph told him they should not be talking, and he should wait for police to arrive from Oceanside, California. However, Henderson insisted on making a statement.

Detective Rudolph testified he then advised Henderson of his *Miranda*[4] rights. Henderson said he understood those rights and wanted to talk. Henderson told Rudolph he and Tamara had an argument, that he got his gun during the course of the argument,

---

[4]     *Miranda v. Arizona* (1966) 384 U.S. 436.

and began pointing it at Tamara because he wanted to intimidate her. Henderson said Tamara made him angrier, he pulled the trigger, and the gun made a clicking sound.

Henderson also told Detective Rudolph that he told Tamara, "Bitch, if that would have went 'bang,' you wouldn't be talking all this shit." Henderson said he and Tamara continued to yell obscenities at each other, he racked the gun and pointed it at her again, and Tamara screamed and pushed him. Defendant also told Detective Rudolph that Tamara made him so mad, he pointed the gun at her and shot her in the chest. Henderson added he should have killed himself. Henderson also said he had another plan, and he never would have been caught if he had gone through with that plan.

District attorney investigator Ted Henson testified he went to St. Louis with another investigator to extradite Henderson back to San Diego County. While they were waiting for their flight at the St. Louis airport, Henderson made unsolicited statements about where he was going when he was caught. Henderson said he was on his way to Lexington, Kentucky, to visit a child, from there he would go to Atlanta and then to Alabama to visit his mother and a couple of other children. Henderson also told Henson he planned to then flee to Honduras with a clean passport and he would stay there until his money ran out.

D. *Defense Surrebuttal*

Henderson testified that when he spoke to Detective Randolph, he told the detective he and Tamara argued, he wielded a gun during the argument, and he shot her. He denied telling Detective Randolph why he shot her. He never told the detective he shot her because he was angry with her. He told Detective Randolph it was an accident.

18

DISCUSSION

I. *ADMISSION OF EVIDENCE OF PRIOR DOMESTIC VIOLENCE*
*(EVID. CODE, §§ 352, 1109)*

A. *Abuse of Discretion Claim*

Henderson first contends the court abused its discretion under Evidence Code section 352 by admitting evidence that he committed prior acts of domestic violence against his former wife, J.H. We reject this contention.

1. *Background*

The prosecutor filed a motion in limine seeking to introduce evidence of acts of domestic violence the prosecution claimed Henderson committed against two other women: J.H. and A.C.[5] The prosecutor argued the evidence was admissible under Evidence Code section 1109 and should not be excluded under Evidence Code section 352.

At the hearing on the motion, at the court's request, the prosecutor made a record of the evidence he sought to admit regarding Henderson's prior conduct toward J.H. Following arguments by the prosecutor and defense counsel, the court found that remoteness was not an issue because the relationship between Henderson and J.H. occurred "in 2002 through 2003," within the prior 10 years. Noting the proffered evidence showed there were multiple acts of *physical violence*, the court found none was more inflammatory than the acts charged in the present case. The court also found the

_____

5    A.C. did not testify at trial, and none of the issues raised in this appeal involves her.

19

jury would not be confused by the proffered evidence, and the evidence was "probative to show that [Henderson] was willing to use and had a propensity to use physical violence on the date [Tamara] was shot."

Separately addressing the proffered evidence that Henderson had committed a sexual assault of J.H., the court indicated that sexual assault is a very serious crime, and evidence showing Henderson sexually assaulted J.H. would likely draw an emotional reaction from jurors. The court noted that although prior acts evidence under Evidence Code section 1109 did not have to be identical or even similar, there were substantial differences between the facts surrounding the sexual assault and those involving the shooting in this case. Noting that the proffered evidence showed Henderson was telling J.H. she did not have the power to leave him, the court found that this "seems to be the opposite of . . . the instant case" in which Henderson "was indicating the relationship was over and he was done with her." The court added: "So it wasn't that he was trying to keep [Tamara] or continuing to control her. He was terminating the relationship, per the People's theory, and did so by shooting her." Finding that "the probativeness of the actual sexual assault [of J.H.] is low [and] the potential prejudice is high," the court ruled the evidence of Henderson's sexual assault of J.H. was not admissible under Evidence Code section 1109.

At trial, J.H. gave the testimony summarized, *ante*, regarding Henderson's acts of physical violence against her.

2. *Applicable Legal Principles*

"Evidence Code section 1109 allows the introduction of evidence of [a] defendant's commission of prior acts of domestic violence in a criminal action charging [the] defendant with an offense involving domestic violence." (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138.) Specifically, subdivision (a)(1) of Evidence Code section 1109 provides in part (with exceptions not applicable here): "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352."

Evidence Code section 1109 creates an exception to the general rule codified in Evidence Code section 1101, subdivision (a) that precludes admission of uncharged misconduct to show the defendant had a propensity to commit crimes. (Evid. Code, § 1109, subd. (a)(1); see also *People v. Johnson* (2000) 77 Cal.App.4th 410, 417.)

Under Evidence Code section 352, evidence is properly excluded if its probative value is "substantially outweighed" by the probability that its admission will necessitate undue consumption of time or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.) Thus, the trial court has discretion to exclude evidence of prior acts of domestic violence if the probative value is substantially outweighed by the probability its admission would necessitate undue consumption of time or create a substantial danger of

21

undue prejudice, of confusing the issues, or of misleading the jury.  (Evid. Code,

§§ 1109, subd. (a)(1), 352; *Cudjo*, at p. 609.)

"The prejudice which exclusion of evidence under Evidence Code section 352 is

designed to avoid is not the prejudice or damage to a defense that naturally flows from

relevant, highly probative evidence.  '[All] evidence which tends to prove guilt is

prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is

"prejudicial."  The "prejudice" referred to in Evidence Code section 352 applies to

evidence which uniquely tends to evoke an emotional bias against the defendant as an

individual and which has very little effect on the issues.  In applying [Evidence Code]

section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988)

46 Cal.3d 612, 638.)  Thus, in cases involving the proffering of evidence of prior acts of

domestic violence under Evidence Code section 1109, one of the issues to be decided is

whether there is a likelihood the evidence will inflame the jurors so that they will base

their verdict not on the evidence presented as to the charged offenses, but rather on their

emotional response to the defendant's commission of the uncharged prior acts or crimes.

A trial court's decision to admit evidence of prior acts of domestic violence as

propensity evidence under Evidence Code sections 1109 and 352 is reviewed for an

abuse of discretion.  (*People v. Poplar*, *supra*, 70 Cal.App.4th at p. 1138.)  "[T]he court's

exercise of discretion will not be disturbed on appeal except upon a showing that it was

exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest

miscarriage of justice."  (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233.)

22

3. *Analysis*

Henderson has failed to meet his burden on appeal of establishing that in permitting Henderson's former wife, J.H., to testify about his uncharged acts of physical domestic violence against her the court exercised its discretion under Evidence Code section 352 in an arbitrary, capricious or patently absurd manner resulting in a manifest miscarriage of justice. J.H.'s testimony showed that in 2002 and 2003, before she divorced him, Henderson committed numerous acts of violence against her, such as throwing her against a wall, choking her by wrapping a television cable cord around her neck until she could not breathe, hitting and slapping her, threatening to kill her, and kicking her. The court properly found that, although the evidence showed there were multiple acts of *physical violence*, court found none was more inflammatory than the acts charged in the present murder case. The court also properly found the jury would not be confused by J.H.'s testimony, and the proffered evidence was probative to show Henderson had a propensity to use physical violence against an intimate partner on the date he admittedly shot Tamara.

Even if we were to assume for the purpose of analysis that the court had abused its discretion under Evidence Code section 352, we would conclude Henderson has failed to show the assumed error was prejudicial. Henderson's defense was that he shot Tamara accidentally. However, Detective Rudolph testified that after Henderson waived his *Miranda* rights following his arrest, Henderson told him Tamara had made him so mad during their argument, he pointed the gun at her and shot her in the chest. Although Henderson gave surrebuttal testimony denying he told the detective he shot Tamara

23

because he was angry, a reasonable jury could find beyond a reasonable doubt that his denial was not believable.  Ayorinde Thorpe testified that when he telephoned Henderson on January 1 after the shooting and asked what happened, Henderson replied, "I'm not going to tolerate cheating."  The prosecution's evidence showing Henderson fled the jurisdiction after he shot Tamara supports a finding of consciousness of guilt.

In sum, Henderson has failed to demonstrate the court prejudicially abused its discretion under Evidence Code section 352.

B.  *Violation of Due Process Claim*

Henderson also contends that, "even if Evidence Code section 1109 is not invalid on its face," the court's application of that section to admit J.H.'s testimony regarding prior acts of domestic violence rendered his trial fundamentally unfair, thereby depriving him of his federal constitutional right to due process.  We reject this contention.

In *People v. Falsetta* (1999) 21 Cal.4th 903, as Henderson acknowledges, our Supreme Court rejected a similar attack on analogous provisions of Evidence Code section 1108, subdivision (a), which permit evidence of prior sex offenses to be admitted when a defendant is charged with a sexual offense.  The high court upheld Evidence Code section 1108 against a due process challenge in part because its provisions allow trial courts to exclude evidence that is unduly prejudicial under Evidence Code section 352.  (*Falsetta*, at pp. 917-918.)  It is the discretion given to trial courts to exclude evidence of prior acts under Evidence Code section 352 that satisfies the requirements of due process.  (*Falsetta*, at p. 918.)  We are bound by the Supreme Court's decision in *Falsetta*.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Evidence Code sections 1108 and 1109 are virtually identical, except that the former addresses the admissibility of evidence of sexual offenses while the latter addresses evidence of acts of domestic violence.6  Although the California Supreme Court has not addressed the issue, the intermediate appellate courts have consistently applied the reasoning in *Falsetta* to reject facial federal and state constitutional due process challenges regarding the admission of propensity evidence under Evidence Code section 1109.  (See *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703-704; *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1120; see also *People v. Williams* (2008) 159 Cal.App.4th 141, 147; *People v. Price* (2004) 120 Cal.App.4th 224, 240; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095-1096; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1309-1310 (*Jennings*); *People v. Brown* (2000) 77 Cal.App.4th 1324, 1331-1334; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1026-1027; *People v. Johnson*, *supra*, 77 Cal.App.4th at p. 417.)  We agree with the reasoning and results in these cases and reaffirm our holding in *People v. Cabrera*, *supra*, 152 Cal.App.4th 695. We also agree with the *Jennings* court's observation that "the constitutionality of

---

6      Evidence Code section 1108, subdivision (a) provides:  "In a criminal action in which the defendant is accused of a *sexual offense*, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352."  (Italics added.)  By way of comparison, we again note that Evidence Code section 1109, subdivision (a)(1) provides in part:  "[I]n a criminal action in which the defendant is accused of an *offense involving domestic violence*, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352."  (Italics added.)

[Evidence Code] section 1109 under the due process clauses of the federal and state constitutions has now been settled." (*Jennings*, *supra*, 81 Cal.App.4th at p. 1310.)

We reject Henderson's claim that the application of Evidence Code section 1109 in this case rendered his trial fundamentally unfair. Henderson asserts "[t]he admission of [J.H.'s] testimony rendered [his] trial fundamentally unfair" because "[t]he record contains evidence of only a single incident of violence by [him] against Tamara—the incident which resulted in her death"; the People "presented no evidence of ongoing abusive and controlling behavior, such as that described by [J.H.], in [his] relationship with Tamara"; and, thus, "[b]ecause of the lack of such evidence, [J.H.'s] testimony about [his] behavior toward her did not reasonably support an inference that [he] had acted in the same way toward Tamara." He also asserts J.H.'s testimony "created a substantial risk the jury would view [him] as a 'serial abuser' and convict him on that basis alone."

These assertions are unavailing. Ample evidence apart from J.H.'s Evidence Code section 1109 propensity testimony supports the jury's guilty verdict, including Henderson's self-incriminating statements to Detective Rudolph and Ayorinde Thorpe (discussed, *ante*).

## II. *CLAIM OF INSTRUCTIONAL ERROR* (*CALCRIM NO. 852*)

Henderson next contends the court's instructions to the jury under CALCRIM No. 852 violated his federal constitutional right to due process by allowing the jury to find by only a preponderance of the evidence that he committed uncharged prior acts of

26

domestic violence, and then to infer his guilt of the currently charged offense from the commission of the prior acts.[7] This contention is unavailing.

A. *Background*

The court gave the following modified version of CALCRIM No. 852, which instructed the jury regarding its consideration of the propensity evidence of Henderson's prior acts of domestic violence that the prosecution presented under Evidence Code section 1109:

> "The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically: domestic violence against [J.H.].
>
> "'*Domestic violence*' means abuse committed against an adult who is a spouse or former spouse.
>
> "'*Abuse*' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else.
>
> "You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.
>
> "If the People have not met this burden of proof, you must disregard this evidence entirely.

---

7       Henderson acknowledges the California Supreme Court approved a substantially similar instruction, CALJIC No. 2.50.01, in *People v. Reliford* (2003) 29 Cal.4th 1007, 1016, and that this court is required to follow *Reliford*. Henderson asserts he "raises the issue here to preserve it for possible federal review."

27

"If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit domestic violence as charged in Count [1] or a lesser included offense of Count [1]. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Count [1] or a lesser included offense of Count [1]. The People must still prove each charge and allegation beyond a reasonable doubt."

B. *Analysis*

In *People v. Reyes* (2008) 160 Cal.App.4th 246 (*Reyes*), the Court of Appeal considered and rejected the same contention Henderson raises here. In *Reyes*, the defendant claimed CALCRIM No. 852 violated his right to due process because it allowed the jury to find him guilty of the charged offenses (misdemeanor spousal battery and making a criminal threat) based solely upon finding uncharged offenses true by a preponderance of the evidence. (*Reyes*, at p. 250.)

In rejecting that claim, the *Reyes* court explained that the California Supreme Court held in *Falsetta*, *supra*, 21 Cal.4th at page 915, that Evidence Code section 1108 (discussed, *ante*) conforms with the requirements of due process and that the high court also held in *People v. Reliford*, *supra*, 29 Cal.4th 1007, that CALJIC No. 2.50.01, an "instruction explaining the application of Evidence Code section 1108, is proper." (*Reyes*, *supra*, 160 Cal.App.4th at p. 251.)

The *Reyes* court also explained that "[t]he analysis in *Falsetta* has been used to uphold the constitutionality of Evidence Code section 1109 [citations] and the analysis in

28

*Reliford* has been used to uphold the constitutionality of the corresponding CALJIC instruction, CALJIC No. 2.50.02." (*Reyes*, *supra*, 160 Cal.App.4th at p. 251.) Noting the courts have concluded there is no material difference between CALJIC No. 2.50.01 and CALJIC No. 2.50.02, the *Reyes* court held:

> "Similarly, there is no material difference between the language found constitutional in CALJIC No. 2.50.02 and that in CALCRIM No. 852. In fact, CALCRIM No. 852 is expressed in clearer language and makes more certain the manner in which such evidence may or may not be used by the jury. The reasoning of the cases analyzing CALJIC No. 2.50.02 is equally applicable to the validity and propriety of CALCRIM No. 852." (*Reyes*, *supra*, at pp. 251-252, fns. omitted.)

In rejecting the due process challenge to CALCRIM No. 852, the Court of Appeal reasoned in *Reyes* that this instruction makes clear the evidence of uncharged acts of domestic violence may only be considered if it has been established by a preponderance of the evidence, the instruction explains what is meant by that burden of proof, and the evidence must be disregarded entirely if that burden is not met. (*Reyes*, *supra*, 160 Cal.App.4th at p. 251.)

The *Reyes* court also reasoned that, like CALJIC No. 2.50.02, CALCRIM No. 852 (1) explains that if the jury finds the defendant committed the uncharged acts of domestic violence, "it may but is not required to conclude the defendant was disposed or inclined to commit domestic violence and may also conclude that the defendant was likely to commit and did commit the crimes charged in the case" (*Reyes*, *supra*, 160 Cal.App.4th at p. 252, italics omitted); and (2) clarifies that even if the jury concludes the defendant committed the uncharged acts, this conclusion is only one factor to consider along with

29

all the other evidence, and it is not sufficient by itself to prove the defendant is guilty of the charged offenses. (*Ibid*.) Noting that CALCRIM No. 852 then goes on to state that the People must still prove each element of every charge beyond a reasonable doubt, the *Reyes* court approvingly stated that "CALCRIM No. 852 goes further than CALJIC No. 2.50.02 with a clarification which inures to the defendant's benefit." (*Reyes*, *supra*, at p. 252.) We agree with the reasoning and results in *Reyes.* Accordingly, we adopt its analysis as our own.

## III.  *PROSECUTORIAL MISCONDUCT*

Henderson next contends the prosecutor committed misconduct and deprived him of a fair trial during the prosecutor's cross-examination of Henderson by asking questions implying defense counsel had attempted to conceal information from the jury and had fabricated Henderson's defense that he accidentally shot Tamara. He asserts "there is at least a reasonable likelihood the jurors understood the prosecutor's questions as impugning the integrity of defense counsel, by suggesting he had attempted to conceal the truth from them and had fabricated the defense of accident." We conclude Henderson has failed to demonstrate a reasonable likelihood the jury understood the prosecutor's questions as impugning the integrity of defense counsel, and, thus, he has failed to establish he was denied a fair trial.

A.  *Background*

The following exchange occurred during the prosecutor's cross-examination of Henderson:

30

"[Prosecutor]:  When we went through your account on direct examination of what happened on January 1, 2011, *is there a reason why you went through the story so quickly?*

"[Henderson]:  Can you --

"[Defense counsel]:  Objection.  Assumes facts not in evidence.  I asked the questions.

"[Court]:  *Sustained.*

"[Prosecutor]:  *Is there a reason you didn't give us more detail about the incident surrounding the shooting?*

"[Defense counsel]:  Same objection.

"[Court]:  *Sustained.*"  (Italics added.)

Shortly thereafter, the following exchange took place:

"[Prosecutor]:  *When is it that you decided that this was going to be your defense, the defense of accident?*

"[Defense counsel]:  Objection.  Argumentative.

"[Court]:  *Sustained.*"  (Italics added.)

Defense counsel later moved for a mistrial, arguing the prosecutor's questions amounted to "egregious misconduct."  At the hearing on the motion, which was held before court instructed the jury, defense counsel asserted that the thrust of the prosecutor's closing argument was going to be that Henderson was lying and the shooting was not an accident.  Defense counsel also claimed that although the court had sustained the defense objections to the prosecutor's questions, there was a "severe danger" the jury would think he (defense counsel) and Henderson "cooked up a defense because there was nothing else that could be done."

31

The prosecutor responded that, throughout the trial, he had done nothing to cast aspersions on defense counsel or to suggest that counsel fabricated a defense; rather, his questions were directed at Henderson and were focused on his conduct. The prosecutor argued that, "when people lie . . . [t]hey give a very vague story, and then when they're asked pointed questions about it, then all of a sudden they feel the need to give more detail . . . ."

Noting that the prosecutor was "entitled to argue [Henderson] was lying," the court admonished the prosecutor that his questions were "inartful at best." Noting that it had immediately sustained the defense objections to the prosecutor's questions, the court found there was no basis for granting Henderson's mistrial motion. The court explained:

> "I think it was clear . . . that [the prosecutor] felt that [Henderson] was being less than truthful. I did not get a sense from the questioning or from his mannerisms—but more importantly, the questioning—that it was by implication directed towards [defense counsel] . . . ."

Henderson's counsel suggested that, if the court denied the mistrial motion, in the alternative it should give the following limiting instruction to the jury: "The prosecutor asked questions that implied [Henderson] or his lawyer had orchestrated [Henderson's] testimony or concocted the defense of accident. This was improper and misconduct. You may, but are not required to, regard this as evidence the prosecutor thinks the case is weak." The prosecutor objected that such an instruction was improper.

Following further discussion, the court stated that, by sustaining the defense objections to the prosecutor's three questions, it had indicated to the jury that the questions were "inappropriate." The court reiterated that it "didn't get the impression"

32

that the prosecutor, in asking the three questions, "was saying that he thought [defense counsel] was lying or concocting a defense in this case." The court added, "I think it was clear [the prosecutor], by implication, was making that assertion *against Mr. Henderson*. And . . . in indicating that [Henderson] didn't previously relate these details, that is an appropriate vehicle to get that information in front of the jury." (Italics added.)

The court indicated it was not inclined to give a limiting instruction, stating, "[F]rankly, I don't think there was that much attention drawn to this, and I think the limiting instruction would do no more [than] draw attention to it. They're going to be told if an objection was sustained, they're not to speculate as to what the reason is or what the answer should have been and to disregard it. [¶] . . . I think it would tend to make any problem that did exist worse by drawing attention to it." Consistent with its ruling, the court later instructed the jury under CALCRIM No. 222 to ignore any questions to which objections had been sustained.[8]

B. *Applicable Legal Principles*

A prosecutor in a criminal case can commit misconduct under either federal or state law. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a

---

[8]    The court's instruction under CALCRIM No. 222 told the jury in part: "During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses. I ruled on the objections according to the law. If I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did. If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose."

33

denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"'A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel.'" (*People v. Turner* (2004) 34 Cal.4th 406, 429, quoting *People v. Hill* (1998) 17 Cal.4th 800, 832; see also *People v. Cummings* (1993) 4 Cal.4th 1233, 1302 [prosecutor commits "misconduct . . . by impugning the honesty and integrity of defense counsel"].) Thus, "it [is] improper for the prosecutor to imply that defense counsel has fabricated evidence or otherwise to portray defense counsel as the villain in the case." (*People v. Thompson* (1988) 45 Cal.3d 86, 112; see also *People v. Bain* (1971) 5 Cal.3d 839, 847 ["The unsupported implication by the prosecutor that defense counsel fabricated a defense constitutes misconduct."].) "Casting uncalled for aspersions on defense counsel directs attention to largely irrelevant matters and does not constitute comment on the evidence or argument as to inferences to be drawn therefrom." (*People v. Thompson*, *supra*, at p. 112.)

When a claim of prosecutorial misconduct focuses on the prosecutor's questions or comments before the jury, "'the question is whether there is a *reasonable likelihood* that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202-1203, italics added, quoting *People v. Berryman* (1993) 6 Cal.4th 1048, 1072, overruled on another point in *People v. Hill*, *supra*, 17 Cal.4th at pp. 822-823; see also *People v. Cummings*, *supra*, 4 Cal.4th at

34

p. 1302 ["If there is a reasonable likelihood that the jury would understand the prosecutor's statements as an assertion that defense counsel sought to deceive the jury, misconduct would be established."].)

"When a defendant chooses to testify concerning the charged crimes, the prosecutor can probe the testimony in detail and the scope of cross-examination is very broad." (*People v. Dykes* (2009) 46 Cal.4th 764, 731; see also *People v. Cole*, *supra*, 33 Cal.4th at p. 1203 ["prosecutors 'have wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide'"].)

C. *Analysis*

As noted, Henderson claims the prosecutor committed misconduct by asking him the following three questions during cross-examination: (1) "When we went through your account on direct examination of what happened on January 1, 2011, is there a reason why you went through the story so quickly?"; (2) "Is there a reason you didn't give us more detail about the incident surrounding the shooting?"; and (3) "When is it that you decided that this was going to be your defense, the defense of accident?"

The record does not support Henderson's claim there is a *reasonable likelihood* the jurors understood the prosecutor's three questions as impugning the integrity of defense counsel by suggesting that *he* (defense counsel) had attempted to conceal the truth from them during his direct examination of Henderson, and that he had also fabricated Henderson's defense of accident. None of the questions mentions or in any way alludes to Henderson's counsel. The court expressly found it was "clear" the prosecutor, by

35

implication, was asserting that *Henderson*—not his counsel—was lying and had concocted his accident defense. In making this finding, the court stated, "I did not get a sense from the questioning or from his mannerisms . . . that it was by implication directed towards [defense counsel.]" The court was able to observe the prosecutor's mannerisms when the prosecutor asked Henderson the three questions, and, thus, was able to assess whether the prosecutor, by implication, was also accusing defense counsel of concealing facts or fabricating a defense. We note the court's finding that the prosecutor was "entitled to argue [Henderson] was lying" finds support in California case law. The California Supreme Court has explained that "'[w]hen a defendant's testimony contradicts the strong evidence of his guilt, it is not improper to call him a liar.'" (*People v. Friend* (2009) 47 Cal.4th 1, 32.) Here, the evidence of Henderson's guilt (discussed, *ante*) was strong.

In light of our conclusion that Henderson has failed to meet his burden of demonstrating a reasonable likelihood the jury understood the prosecutor's questions as impugning the integrity of defense counsel, we also conclude he has failed to establish he was denied a fair trial as a result of prosecutorial misconduct. Even if we were to assume Henderson had met his burden, on this record we could not conclude such misconduct "infect[ed] the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales*, *supra*, 25 Cal.4th at p. 44.) When a trial court sustains objections to the prosecutor's questioning, we assume any prejudice was abated. (*People v. Dykes*, *supra*, 46 Cal.4th at p. 764.) Here, defense counsel immediately objected to each of the prosecutor's three questions, and the court immediately sustained each objection. Also, as noted, the court gave a curative instruction under CALCRIM No. 222

36

instructing the jury to ignore any questions to which objections had been sustained. "We presume the jury followed the court's instructions." (*People v. Avila* (2006) 38 Cal.4th 491, 574.)

Even if we were to assume the prosecutor committed error under state law by asking the three questions at issue here, we would conclude reversal of the judgment is not required. Because Henderson's federal constitutional right to a fair trial was not violated, we do not apply the federal harmless error standard set forth in *Chapman v. California* (1967) 386 U.S. 18. Rather, we apply the California standard for harmless error, that is, whether, based on the totality of the evidence, it is reasonably probable Henderson would have obtained a more favorable result absent the claimed prosecutorial misconduct. (*People v. Castillo* (2008) 168 Cal.App.4th 364, 386; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Given the strong evidence of Henderson's guilt, we conclude he has failed to meet his burden of demonstrating a reasonable probability he would have obtained a more favorable result absent the assumed prosecutorial misconduct.

## IV. *CUMULATIVE ERROR CLAIM*

Last, Henderson claims the cumulative effect of the claimed errors requires reversal of the judgment. We reject this claim.

"If none of the claimed errors were individual errors, they cannot constitute cumulative errors that somehow affected the . . . verdict." (*People v. Beeler* (1995) 9 Cal.4th 953, 994, abrogation on other grounds recognized by *People v. Pearson* (2013) 56 Cal.4th 393, 462.) Here, we have rejected all of Henderson's other claims of error. Accordingly, we also reject his claim of cumulative error.

DISPOSITION

The judgment is affirmed.


NARES, J.

WE CONCUR:


HUFFMAN, Acting P. J.


AARON, J.